| | | |
|---|---|---|
| HILARIO RAZURA JIMENEZ, et al | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Civil Action No. 3:11-0276 |
| v. | ) | Jury Demand |
| | ) | |
| VANDERBILT LANDSCAPING LLC, | ) | |
| et al. | ) | |
| | ) | |
| Defendants. | ) | |

**BRIEF IN SUPPORT OF PLAINTIFFS' MOTION TO DISMISS COUNTERCLAIMS BY LARRY VANDERBILT SR. AND JOFFREY VANDERBILT**

## INTRODUCTION

Plaintiffs, sixteen Mexican workers imported by Vanderbilt Landscaping LLC, and Larry and Joffrey Vanderbilt (hereafter "Vanderbilt" or "Vanderbilt Defendants") in 2010 allege that Vanderbilt and other Defendants subjected H-2B guestworkers to extreme exploitation and labor trafficking in violation of state and federal laws.[1]

Prior to this litigation, Vanderbilt's actions were the subject of an ongoing labor dispute with former guestworkers, including some of the Plaintiffs herein, and that dispute has resulted in governmental oversight, public scrutiny, and public demands that Vanderbilt conduct its business in conformance with community standards including respect for civil, labor, and human rights and employment of available, unemployed U.S. workers.

In retaliation for these labor activities and in order to chill Plaintiffs and others from engaging in protected First Amendment activities, petitioning the government, and participating

---

[1] Plaintiffs make additional allegations about 2009 and against Defendants OneSource Landscape and Golf Services, Inc., ABM Services, Inc., ABM Industries Inc., and Larry Vanderbilt, Sr. but those allegations are not relevant to the present motion.

in collective activity, Vanderbilt filed frivolous tort counterclaims against three of the Plaintiffs in this suit.

Plaintiffs now move to dismiss those frivolous counterclaims pursuant to Rule 12(b)(6). Immediate action dismissing Defendants' counterclaims is necessary to protect fundamental rights of public participation from the coercive, deterrent, and costly threat of civil litigation. Legislatures and courts have long recognized civil litigation filed against employees *in response to the employee asserting statutory workplace rights* is actionable retaliation which should result in striking the retaliatory claims and sanctions. The filing of the frivolous counterclaims in this litigation are the next step of an ongoing campaign of threats, retaliation, termination, and private forced deportation carried out against former employees by the Vanderbilt Defendants.

The Vanderbilt Defendants' counterclaims are a paradigmatic example of what the Tennessee Legislature has termed a "Strategic Lawsuit Against Political Participation" ("SLAPP"). That is, a lawsuit aimed at discouraging the exercise of speech and petition rights and silencing critics of the labor practices of Vanderbilt Landscaping LLC and its principles. Because such lawsuits pose a serious threat to core First Amendment activities, the Legislature enacted the Tennessee Anti-SLAPP Act, T.C.A. 4-21-1001 et seq. ("Anti-SLAPP Act") with the intent "to provide protection for individuals who make good faith reports of wrongdoing to appropriate governmental bodies" with the recognition that "the threat of a civil action for damages in the form of a 'strategic lawsuit against political participation' and the possibility of considerable legal costs" can "act as a deterrent to" and "effectively punish" individuals who are "exercising the constitutional right to speak and petition the government for the redress of grievances." The counterclaims also represent actionable FLSA retaliation against workers raising FLSA complaints with the U.S. Department of Labor and through this lawsuit. Finally,

as set forth below, the frivolous counterclaims fail to state claims and must be dismissed pursuant to Fed. R. Civ. P. 12(b)(6).

## STATEMENT OF THE CASE AND MOTION

Plaintiffs (hereafter referred to as "Guestworkers") are sixteen low income, limited English proficient farmworkers from rural Mexico who entered the United States on temporary H-2B work visas to work for Vanderbilt Landscaping LLC in 2009 and 2010. These workers allege that the Vanderbilt Defendants violated the FLSA, breached their work contracts and committed fraud in both 2009 and 2010. In addition, the three Plaintiffs who worked in 2010 (the three who are counterclaim defendants) allege that in 2010, the Vanderbilt Defendants trafficked them to the United States from Mexico and subjected them to forced labor on contracts with the Tennessee Department of Transportation for highway mowing and litter removal on Tennessee's highways and interstates. (1st Amended Compl. at 1) (Doc. 10) (hereinafter "Complaint"). The Guestworkers allege that the Vanderbilt Defendants attempted to exercise complete control over them by confiscating their passports, failing to pay wages owed, subjecting them to unsafe and unhealthy living and working conditions, and subjecting them to a scheme of constant surveillance, threats of serious harm and abuse of the legal process, and psychological coercion. (Complaint at ¶¶ 2, 3).

In response to these claims, the Vanderbilt Defendants filed nine counterclaims against the three Guestworker plaintiffs who worked in 2010.[2] These counterclaims purport to state claims for:

      1. Defamation/Libel

---

[2] The three plaintiffs who worked in 2010 are Hilario Razura Jimenez, Jose Manuel Guerrero Gomez, and J. Refugio Castellon Luna.

2. False Light/Invasion of Privacy

3. Tortious or Intentional Interference with Business Relations;

4. Procurement of Breach of Contract;

5. Intentional/Reckless Infliction of Emotional Distress;

6. Abuse of process;

7. Civil Conspiracy;

8. Concert of Action; and

9. Punitive Damages.

(Answer of Vanderbilt Defendants) (filed April 20, 2011) (Doc. 15) (hereinafter "Answer"). All of these counterclaims are based on the same essential allegations: (1) that, on or before August and September 2010, the three Plaintiffs made statements to media outlets indicating that the Vanderbilt Defendants confiscated their passports, subjected them to surveillance, kidnapped them, failed to pay wages on time and forced them to live in substandard housing; (2) that these statements caused newspapers and other media to publish articles in August and September 2010 referencing the Vanderbilt's mistreatment of its workers; (3) that the statements caused governmental entities to investigate the Vanderbilt Defendants; and caused the government of Nashville to not go forward with an "expected" contract with the Vanderbilt Defendants. (Answer at ¶¶ 43, 55, 50,87-88).

Defendants make only conclusory allegations that Plaintiffs' acted with malice and knowledge of the falsehood of their alleged statements. (Answer at ¶¶ 46, 51,54). The only factual support Defendants offer for their conclusory allegations is that various governmental investigations triggered by Plaintiffs statements "revealed the [Plaintiffs'] claims were false and baseless." (Answer at ¶ 56).

Yet findings from state and federal agencies referenced by Defendants validated many of Plaintiffs' complaints as is evident from the citations issued for serious health and safety violations, failure to pay federal wages, and violations of the rules of the H-2B program. The Department of Labor's Employment and Training Administration also issued Vanderbilt a Notice of Debarment from the program based on Vanderbilt's "pattern or practice of acts that reflect a significant failure to comply with employer's obligations." 20 C.F.R.§ 655.31(e)(3). DOL has heretofore debarred only five employers in the past three years, out of the approximately 3000 who participate annually—reflecting the severity of the sanction and Vanderbilt's violations. *See Report on Debarment from the DOL, ETA, Office of Foreign Labor Certifications, http://www.foreignlaborcert.doleta.gov/pdf/Debartment_List_Revisions.pdf.*[3]

Because Defendants have referenced the results of these investigations in their pleading, the investigation reports may be considered as part of this 12(b)(6) motion without converting it to a summary judgment proceeding.[4] *Barriteau v. PNC Financial,* 285 Fed. Appx. 218, 219 (6th Cir. 2008). These documents include: (1) a citation by the Tennessee Occupational and Health Administration finding housing and safety violations at Vanderbilt's labor camps and worksites, *see* Exhibit 1, November 18, 2010, TOSHA citations; (2) a determination by the Administrator of the Department of Labor Wage Hour Division finding that Defendants violated various DOL H-2B requirements and failed to pay foreign workers required wages*, see* Exhibit 2, Feb. 16, 2011, U.S. DOL Wage and Hour Division, Administrator's Determination Pursuant to H-2B Regulations; (3) an official DOL notice barring the Vanderbilt Defendants from future participation in temporary guestworker programs because of the seriousness of their violations,

---

[3] According to the flcdatacenter, DOL certified approximately 3,100 employers and 94,000 guestworkers in 2010. *See* http://www.flcdatacenter.com/CaseH2B.aspx
[4] The April 4, 2011 article in the *City Paper* cited in counterclaim paragraph 57 and 59 is also admissible for the same reason and is attached as Exhibit 5.

*see* Exhibit 3, March 15, 2011, U.S. DOL Employment and Training Administration, Notice of Debarment; and, (4) an official finding by U.S. DOL Wage and Hour Division for failure to pay $18,000 in back wages, *see* Exhibit 4, March 28, 2011, U.S. DOL Press Release from the Wage and Hour Division.[5]

The citations are summarized as follows including 18 serious health and safety violations, violations for failure to pay wages, and a notice of intent to debar from the H-2B program:

| USDOL, Employment and Training Administration | |
|---|---|
| Failed to proper recruit U.S. workers as required by federal regulations | $6,500 penalty |
| Placement of H-2B workers outside area of intended employment | $5,000 penalty |
| Failure to accurately specify the date of temporary need, reasons for temp need and number of workers on application | $6,500 penalty |
| | $18,000 total penalties[6] |
| **USDOL, Wage and Hour Division** | |
| Unpaid wages to employees during 2010 season. | Back wages of $18,496[7] |
| **Tennessee Occupational Safety and Health Administration** | |
| Serious Violation (Mason worksite) 29 C.F.R. 1910.212(a)(1) Vanderbilt failed to ensure weedeaters had adequate safety guards | $1000.00 |
| Serious Violation (Mason worksite) 29 C.F.R. 1910.210(c)(2)(i) Vanderbilt failed to ensure tractors had adequate engine guards | $1400.00 |
| Nonserious Violation  (Mason worksite) TDLWD Rule 0800-1-3-.04(3)(b)(3) Vanderbilt's executives failed to certify records related to workplace injuries | $400 |
| Nonserious violation (Mason worksite) TDLWD Rule 0800-1-3-.05(2)(b)(2) Vanderbilt was unable to provide copies of workplace injury logs within the time required by law | $400 |
| Serious Violation (Mason Labor Camp) 29 C.F.R. 1910.142(k)(2) Vanderbilt's Mason TN labor camp did not include a person trained in first-aid as required by the OSHA labor camp standards. | $1,400 |

---

[5] Upon information and belief, Vanderbilt possesses more detailed citations related to the $18,000 back wage citation.  The public information is available on the U.S. DOL website at *http://www.dol.gov/whd/media/press/whdpressVB3.asp?pressdoc=Southeast/20110328_1.xml*
[6] Upon information and belief Vanderbilt has contested this assessment and is proceeding through the administrative appeals process.
[7] Upon information and belief, Vanderbilt did not contest this assessment and paid the backwages to the Department of Labor

| | |
|---|---|
| Serious Violation (Mason Labor Camp)<br>29 C.F.R. 1910.151(b)<br>Vanderbilt failed to ensure worksites contained person trained to render first-aid to injured employees because there was neither an infirmary, clinic nor hospital near the proximity to the workplace. | |
| Serious Violation (Mason Labor Camp)<br>29 C.F.R. 1910.303(f)(2).<br>Vanderbilt failed to label circuit breakers in the electric box to ensure ability to disconnect in case of emergency. | $1,200 |
| Serious Violation (Mason Labor Camp)<br>29 C.F.R. 1910.304(a)(2)<br>Vanderbilt failed to ground conductors to ensure reverse designated polarity as required by OSHA labor camp standards. | |
| Serious Violation (Mason Labor Camp)<br>20 C.F.R. 1910.305(b)(1)(i)<br>Vanderbilt failed to protect conductors and wires to circuit breakers. | |
| Serious Violation (Mason Labor Camp)<br>29 C.F.R. 1910.305(b)(1)(ii)<br>Vanderbilt failed to close unused openings in electrical circuit breaker box. | |
| Serious Violation (Mason Labor Camp)<br>29 C.F.R. 1910.305(b)(2)<br>Vanderbilt failed to ensure electrical receptacles in labor camps had covers and faceplates as required by OSHA labor camp standards | |
| Serious Violation (Mason Labor Camp)<br>29 C.F.R. 1910.305(j)(2)(iv) Vanderbilt placed electrical receptacles in labor camps in wet and damp locations causing danger to employees. | |
| Serious Violation (Mason Labor Camp)<br>29 C.F.R. 1910.305(g)(1)(iv)(A)<br>Vanderbilt used extension cords of providing electrical service to trailers in the labor camp housing. | $1,200 |
| Serious Violation (Mason Labor Camp)<br>29 C.F.R. 1910.305(g)(1)(iv)(C)<br>Vanderbilt ran extension cords providing electrical service to trailers in labor camps through doorways in the electrical maintenance shop. | |
| Serious Violation  (Mason Labor Camp)<br>29 C.F.R. 1910.305(g)(2)(ii)<br>Vanderbilt spliced extension cords providing electrical service to trailers in labor camps to connect to other fixture. | |
| Serious Violation (Mason Labor Camp)<br>29 C.F.R. 1910.334(a)(2)(ii)<br>Vanderbilt used visibly damaged extension cords to provide electrical service to trailers in labor camps. | |
| Serious Violation (Mason Labor Camp)<br>29 C.F.R. 1910.334(a)(4)<br>Vanderbilt stretched extension cords providing electrical service to trailers in labor camps "through a ditch, over a driveway, and into a maintenance shop, and the cords were not approved for outdoor, wet locations." | |
| Nonserious Violation (Mason Labor Camp)<br>29 C.F.R. 1910.142(b)(2)<br>Vanderbilt failed to provide labor camps with at least 50 square feet of floor space for each occupant as required by OSHA labor camp standards | $300 |
| Nonserious violation (Mason Labor Camp)<br>20 C.F.R. 1910.142(b)(3) | |

| | |
|---|---|
| Vanderbilt failed to provide beds with at least 36 inches apart and elevated at least 12 inches from the floor. | |
| Nonserious Violation (Mason Labor Camp)<br>20 C.F.R. 1910.142(b)(8)<br>Vanderbilt failed to screen doors and windows to labor camp buildings. | $300 |
| Nonserious Violation (Mason Labor Camp)<br>29 C.F.R. 1910.142(h)(1)<br>Vanderbilt failed to provide "fly tight, rodent tight, impervious, cleanable or single service contained for the storage of refuge." | |
| Nonserious Violation (Mason Labor Camp)<br>29 C.F.R. 1910.142(b)(9)<br>Vanderbilt failed to provide at least 100 square feet per person in the labor camp in buildings where workers cooked, lived, and slept. | $300 |
| Nonserious Violation (Mason Labor Camp)<br>29 C.F.R. 1910.141(d)(3)(iv)<br>Vanderbilt failed to provide labor camp provided with adequate shower facilities and shower facilities were not provide with hot running water. | $200 |
| Nonserious Violation (Mason Labor Camp)<br>29 C.F.R. 1910.142(f)(3)<br>Vanderbilt failed to provide hot running water for baths and showers in the labor camp as required by OSHA standards. | |
| Nonserious Violation (Mason Labor Camp)<br>29 C.F.R. 1910.142(a)(1)<br>Vanderbilt provided labor camp housing approximately 100 feet from standing water not subject to mosquito control measures | $100 |
| Nonserious Violation (Smyrna Labor Camp)<br>29 C.F.R.1910.142(b)(8)<br>Vanderbilt failed to screen doors at labor camp housing | $100 |
| Nonserious violation (Smyrna Labor Camp)<br>29 C.F.R. 1910.142(f)(1)(iii)<br>Vanderbilt failed to provide laundry facilities of one laundry tub per 30 persons. | $200 |
| Nonserious Violation (Smyrna Labor Camp)<br>29 C.F.R. 1910.142(k)(2)<br>Vanderbilt failed to provide facilities for drying clothes | |
| Nonserious Violation (Smyrna Labor Camp)<br>29 C.F.R. 1910.142(k)(2)<br>Vanderbilt's Mason TN labor camp did not include a person trained in first-aid as required by the OSHA labor camp standards. | $100 |
| Serious Violation (Smyrna Labor Camp)<br>29 C.F.R. 1910.305(b)(2)<br>Vanderbilt failed to ensure electrical receptacles in labor camps had covers and faceplates as required by OSHA labor camp standards | $100 |
| Serious Violation (Smyrna worksite)<br>29 C.F.R. 1910.212(a)(1)<br>Vanderbilt failed to ensure weedeaters had adequate safety guards | $1000.00 |
| Serious Violation (Smyrna worksite)<br>29 C.F.R. 1910.210(c)(2)(i)<br>Vanderbilt failed to ensure tractors had adequate engine guards | $1200.00 |
| Nonserious Violation (Smyrna worksite)<br>TDLWD Rule 0800-1-3-.04(3)(b)(3)<br>Vanderbilt's executives failed to certify records related to workplace injuries | $400 |
| Nonserious violation (Mason worksite)<br>TDLWD Rule 0800-1-3-.05(2)(b)(2) | $400 |

| | |
|---|---|
| Vanderbilt was unable to provide copies of workplace injury logs within the time required by law | |
| Total amount of citations for safety and health violations: | $11,700 |

Plaintiffs now move to strike the Vanderbilt Defendants' counterclaims in their entirety as violative of Tennessee's Anti-SLAPP Act, T.C.A. 4-21-1001 et seq. and as prohibited retaliation under the FLSA. In addition, or in the alternative, Plaintiffs move to dismiss all of the Vanderbilt Defendants' counterclaims pursuant to Rule 12(b)(6) for failing to state claims upon which relief can be granted.

## ARGUMENT

### I. DEFENDANTS' COUNTERCLAIMS VIOLATE TENNESSEE'S ANTI-SLAPP ACT

Governmental monitoring and public scrutiny of Defendants including participation by Plaintiffs is exactly the kind of communication and action the Tennessee legislature intended to protect through the Anti-SLAPP Act. Because Defendants' counterclaims chill Plaintiffs' speech and petition rights and effectively punish them for exercising their constitutional rights to speak and petition the government for redress of grievances, this Court has the power to strike these claims as a preliminary matter. *See* Tenn Code Ann. § 4-21-1001 et seq.

As enacted by Tennessee and many other state legislatures, anti-SLAPP statutes protect the First Amendment rights of individuals where allowing litigation to proceed against them would deter those individuals and others from reporting information to federal, state, or local agencies. For example, anti- SLAPP motions have protected communities speaking out against developers *Dixon v. Superior Court,* 30 Cal. App. 4th 733 (Ca. Ct. App. 1994), low-wage immigrant workers in the garment industry defending their rights, *Street Beat Sportswear, Inc. v. National Mobilization against Sweatshops,* 698 N.Y.S. 2d 820 (N.Y. 1999) (striking New York manufacturer's counterclaims against workers and supporters pursuant to N.Y. Civ. Rights Law

§ 70-a et seq.), immigrants' rights coalitions defending the accountability of retailers for conditions of worker making their clothes, *Fashion 21 v. Coalition for Humane Immigrant Rights of Los Angeles,* 117 Cal. App. 4th 1138 (April 21, 2004) (striking California retailer's counterclaims by a retailer against a workers' center under Cal. Code Civ. P. 425.16 et seq.); and, individuals initiating a recall of an elected official, *Evans v. Unkow,* 38 Call. App. 4th 190 (1995).[8]

State Anti-Slapp statutes build on decades of U.S. Supreme Court and circuit case law applying constitutional constraints to defamation and other claims used to deter and chill protected First Amendment activity—specifically civil rights and labor boycotts and organizing. For example, the Supreme Court relied on the First Amendment to strike down injunctive relief and damages awarded by the Mississippi Supreme Court against individuals and organizations involved in a seven year boycott "seeking racial equality and integration", emphasizing, "the Black citizens named as defendants in this action banded together and collectively expressed their dissatisfaction with a social structure that had denied them rights to equal treatment and respect." *See NAACP v. Claiborne*, 485 U.S. 886, 907 (1982) (holding that First Amendment prohibits liability for lawful protest activity even when the activity has economic consequences for Defendant). Recognizing that, "by collective effort individuals can make their views known, when, individually their voices would be faint or lost", the Supreme Court cited *NAACP v. Alabama ex. rel Patterson*, 357 U.S. 449, 460 (1958), "effective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association, as this Court has more than once recognized by remarking upon the close nexus

---

[8] For a history of First Amendment and Anti-Slapp Legislation and the public policy goals animating state legislatures, see Jerome Braun, Increasing SLAPP Protection: Unburdening the Right of Petition in California, 32 U.C. Davis L. Rev. 965 (199).

between the freedoms of speech and assembly."[9]

Likewise, recognizing the importance of protection for robust speech by employees in labor disputes, the Supreme Court requires employers to show "actual malice" before defamation is actionable. *Letter Carriers v. Austin*, 418 U.S. 264, 284 (1974); *Linn v. United Plant Guard Workers of America*, 383 U.S. 53 (1966). The Court recognized that in the context of labor dispute, the appropriate test for ensuring a balance between the rights of employers and workers is to dismiss allegations of defamation that do not rise to the standard of malice enunciated by the Court in *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964). The Sixth Circuit has recognized the high standard required to show actual malice. In *Davis Company v. United Furniture Workers of America*, 674 F.2d 557 (6th Cir. 1982), the Court recognized that in the context of a labor dispute, the Constitution mandates broad protection of collective speech and action:

> [I]t has been stated that the "most repulsive" speech enjoys immunity if it does not meet the test of actual malice. Moreover, expressions of opinion, though false, and couched in very strong language, are not to be treated as falsifications of facts. Likewise, the use of hyperbole which would not be treated by a hearer or reader as intended to be literally believed is not actionable. This court has held highly offensive language protected by the [National Labor Relations Act], where it is clearly used in a rhetorical rather than a literal way.

(internal citations omitted). These cases recognize the role of Courts in limiting the coercive and deterrent impact of retaliatory claims which chill First Amendment Activity, particularly on behalf of minority groups whose voices are critical to democratic speech and debate.

---

[9] In so doing, the Court recognized the importance of protecting both access to Courts and separate First Amendment rights to speech and association in the context of grassroots civil rights work by groups, like the NAACP, necessary to protect "lawful objectives of equality of treatment by all government, federal, state, and local" for minority groups. *See, e.g. Button,* 371 U.S. 415 (1963) (striking down Virginia's anti-solicitation rule for lawyers as applied to the NAACP and other civil rights groups); *NAACP v. Alabama,* 357 U.S. 449 (1958) (blocking disclosure of membership lists where "disclosure of affiliation with groups engaged in advocacy may constitute as effective a restraint on freedom of association" as other more direct prohibitions on action).

Recognizing the importance of these constitutional principles, the Tennessee legislatures and many others passed anti-SLAPP statutes giving courts additional authority to – as a preliminary matter – strike frivolous retaliatory claims which chill protected First Amendment activity.

To invoke the protections of Tenn. Code Ann. § 4-21-1003 resulting in the immediate dismissal of Defendants' counterclaims, Plaintiffs need only make a *prima facie* showing that the complaint or counterclaim is based on actions arising from a person's "right of free speech or petition under the Tennessee or United States Constitution in connection with a public or governmental issue" that "communicates information regarding another person or entity to an agency of the federal, state, or local government regarding a matter of concern to that agency." Tenn Code Ann. § 4-21-1003(a).

Although Defendants' pleading is far from clear, it appears that Defendants are complaining about statements made by Plaintiffs that triggered investigations by various governmental bodies.[10] To the extent that that is their allegation, the Anti-SLAPP Act clearly protects such communications from retaliatory counterclaims. Once Plaintiffs show that the counterclaims "arise from acts in furtherance of speech and petition rights, the burden shifts to Defendants to demonstrate a reasonable probability of prevailing on each challenged claim including that Plaintiffs "[k]new the information to be false; [or] communicated information in reckless disregard of its falsity." *See Sykes v. Chattanooga Housing Authority*, 2009 Tenn. App. LEXIS 521 (Tenn. Ct. Appeals July 31, 2009) (dismissing defamation claim under Tenn. Anti-SLAPP Act). Defendants must present competent and admissible evidence to show that the Anti-SLAPP Act does not apply as a matter of fact or law. *Id.* Other state Courts interpreting

---

[10] Defendants appear to have taken great care to avoid mentioning that Plaintiffs reported the Defendants to government agencies. A fair reading of their counter-claims, however, illustrates the gravamen of the Defendants' complaints are that the Plaintiffs: complained to governmental agencies about illegal labor practices, participated in those agencies' investigations, spoke out publicly about their labor complaints, and filed a lawsuit to vindicate their rights.

similar statutes have explained, that to prevail, Defendants must "demonstrate that [each counterclaim] is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by [Defendants] is credible." *Matson v. Dvorak*, 40 Cal. App. 4th 539, 548 (1994); *see, e.g., Street Beat Sportswear,* 698 N.Y.S. 2d at 824 *Fashion 21,* 117 Cal. App. 4th at 1147.

Defendants have not and cannot meet this standard. To begin with, many of the statements giving rise to the counterclaims are matters of opinion, rather than of fact that can be shown to be true or false. *Davis Company,* 674 F.2d at 562; *N.L.R.B. v. Container Corp. of America*, 649 F.2d 1213 (6th Cir. 1981) (protecting "abusive" and "insulting" speech including a bulletin implying the general manager was a slave driver and stating that "he expects more and more sq. (sic) footage from the 'chain gang' with nothing in return."); *Rodriguez v. Panayiotou*, 314 F.3d 979 (9th Cir. 2002) (holding that "statements by laypersons that purport to interpret the meaning of a statute… are opinion statements and not statements of fact."). For example, statements that "Vanderbilt Landscaping created an atmosphere of terror for the workers" and that the labor camps were "filthy and overcrowded" are opinions not facts. (Answer at ¶ 53). More importantly, to the extent the alleged statements are facts, the very evidence that Defendants cite for their falsity demonstrates the absolute truth of many of the matters allegedly asserted by Plaintiffs. *See* Ex. 1, Ex. 2, Ex. 3 and Ex. 4. Unless Defendants come forward with specific evidence to support their claims of falsity <u>and</u> malice, their counterclaims must be dismissed pursuant to the Anti-SLAPP Act. *See infra* § III for a more detailed analysis of why Defendants have failed to sufficiently plead and make a *prima facie* showing for <u>each</u> tort claim.

## II. DEFENDANTS' COUNTERCLAIMS SHOULD BE DISMISSED BECAUSE THEY CONSTITUTE UNLAWFUL RETALIATION PROHIBITED BY THE FLSA

The FLSA's anti-retaliation provision was meant "to foster a climate in which compliance with the substantive provisions of [the FLSA] would be enhanced" by protecting employees who come forward with complaints." *DeMario Jewelry, Inc.* 361 U.S. at 292. "By suing an employee who files charges…an employer can place its employees on notice that anyone who engages in such conduct is subjecting himself to the possibility of a burdensome lawsuit." *Bill Johnson's Restaurant*, 462 at 741. The chilling effect is even greater where, as here, the employees are low-wage workers who have limited means to fund a defense. *See, id.* Retaliatory lawsuits can be so damaging to statutory enforcement of minimum workplace standards that even the threat of a retaliatory lawsuit can constitute retaliation. *See Lovejo-Wilson v. NOCO Motor Fuel, Inc.,* 263 F.3d 209, 223 (2d Cir. 2001).

There can be no question that Defendants' counterclaims were filed as retaliation for Plaintiffs' FLSA allegations. An employer's counterclaims are presumed to be retaliatory where, as here, the counterclaims "could have been asserted earlier, but were instead asserted only after the [employee] had initiated the action seeking to vindicate his federal rights." *Kreinik v. Showbran Photo, Inc.*, 2003 U.S. Dist. LEXIS 18276 (S.D.N.Y. Oct. 10, 2003). The alleged defamation that is the basis for all of the counterclaims occurred on or before August of September 2010, yet Defendants waited more than six months – even allowing the statute of limitation to run on their defamation claims (see below Section III A) – before bringing their counterclaims. Plainly Defendants' counterclaims were only filed because Plaintiffs filed the instant lawsuit including FLSA claims.

Given the strong federal interest in protecting workers from retaliation for bringing FLSA

lawsuits, Defendants' retaliatory counterclaims should be dismissed outright. *See e.g. Jacques v. DiMarzio, Inc.,* 216 F. Supp. 2d 139 (E.D.N.Y. 2001) (dismissing baseless and retaliatory counterclaims *sua sponte* and awarding sanctions).

## III. DEFENDANTS' COUNTERCLAIMS MUST BE DISMISSED BECAUSE THEY FAIL TO STATE CLAIMS UPON WHICH RELIEF CAN BE GRANTED

For purposes of a motion to dismiss, the Court must take all of the factual allegations in the complaint as true. *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009). However, the "[f]actual allegations must be enough to raise a right to relief above the speculative level"; they must "state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544 (2007). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but has not 'show[n]'—'that the pleader is entitled to relief.'" *Iqbal,* 129 S. Ct. at 1949-50 (internal citations omitted). Mere legal conclusions, couched as factual allegations do not suffice to avoid a 12(b)(6) dismissal. *See Fritz v. Charter Township of Comstock*, 592 F.3d 718, 722 (6th Cir. 2010) (finding conclusory statements insufficient); *Morgan v. Church's Fried Chicken*, 829 F.2d 10, 12 (6th Cir. 1987) (reiterating that while a court may not "grant a Rule 12(b)(6) motion based on disbelief of a complaint's factual allegations", the court "need not accept as true legal conclusions or unwarranted factual inferences.").

### A. DEFENDANTS' FAIL TO STATE A CLAIM FOR DEFAMATION/LIBEL (Count 1)

This Court should dismiss Defendants' claims for defamation and libel based on (1) the statute of limitations; (2) the fact the only alleged defamation that is not barred by limitations is privileged; and (3) Defendants failure to plead facts to support their allegations of falsehood and malice.

Case 3:11-cv-00276   Document 37   Filed 05/31/11   Page 15 of 28 PageID #: 308

**1. The Allegedly Defamatory Statements Are Time-Barred.**

Defendants' defamation and libel claims appear to be based on oral statements that the Plaintiffs allegedly made to media reporters which resulted in "defamatory articles" being published in the August to September 2010 time frame. *See* (Answer at ¶¶ 43-49). Thus the allegedly defamatory statements must have been made on or before the August-September 2010 time period. The statute of limitations for oral defamation or slander is six months from the time that the allegedly defamatory statements were made. Tenn. Code Ann. § 28-3-103; *Weathers v. Bi-Lo LLC,* 2006 WL 435725 *7 (E.D. Tenn. Feb 26, 2006). Thus any alleged statements made in the August-September 2010 time period were barred by limitations by the end of March 2011, (six months after September 30, 2010), well before Defendants filed their counterclaims on April 20, 2011.[11]

**2. The Statements Giving Rise to the April 2, 2011 article in the *City Paper* are Privileged and Cannot be a Basis for a Claim of Defamation.**

The one allegedly defamatory incident that might, arguably, fall within the 6 month statute of limitations pertains to the April 4, 2011 *City Paper* article discussed in paragraphs 57 and 59 of the counterclaims. A review of that article, however, a copy of which is attached as Exhibit 5, makes clear that the article is based upon the allegations in the present lawsuit and does not quote or otherwise indicate that the Plaintiffs were the source of any information contained in the article. The allegations of Plaintiffs' lawsuit are subject to an absolute judicial privilege and cannot form the basis for a defamation or libel claim. *See Simpson Strong–Tie Company, Inc. v. Stewart,* 232 S.W.3d 18, 22 (Tenn.2007) (citing *Lea v. White,* 36 Tenn. (4 Sneed) 111 (1856); *Evans v. Nashville Banner Pub. Co.*, 1988 Tenn. App. LEXIS 638 (Tenn. Ct. App. Oct. 12, 1988) (recognizing privilege related to publication of public proceedings by local

---

[11]   The discovery rule cannot save Defendants claims as that rule does not apply to defamatory statements. In *Quality Auto Parts Co., Inc. v. Bluff City Buick Co. Inc.,* 876 S.W.2d 818, 821-822 (Tenn.1994).

governmental bodies).

### 3. Defendants Have Not Plead Sufficient Facts to Show that the Purported Defamatory Communications Were False.

In addition to being barred by limitations, Defendants' defamation claims are not properly pled. Defendants make only conclusory allegations that Plaintiffs' factual claims are "baseless and false" without alleging facts to support those conclusory allegations. The only fact pled to support the allegation of falsity refers to the results of governmental investigations, yet those very investigations demonstrate that Defendants "did not pay [Plaintiff] and other migrant workers for the time they worked" and "forced [Plaintiff] and others to live in sub-standard and/or inhumane conditions." (Answer at ¶ 50); *see Exhibits 1-4.*

### 4. Defendants Have Not Plead Sufficient Facts to Show that the Content of the Purported Statements Was Made with Actual Malice.

Because any alleged statements by Plaintiffs were made in the context of a labor dispute, Defendant must plead and show that they were made with actual malice in order to prevail. *See New York Times v. Sullivan,* 376 U.S. 274, 280 (1964); *Linn v. United Plant Guard Workers*, Local 114, 383 U.S. 53, 58 (1966); *National Association of Letter Carriers v. Austin*, 418 U.S. 264, 94 S. Ct. 2770, 41 L. Ed. 2d 745 (1974) (comparing a supervisor and his crew to a slave driver and chain gang did not constitute malice); *Davis Co. v. United Furniture Workers*, 674 F.2d 557 (6th Cir. Tenn. 1982). Recognizing the importance of the actual malice standard in labor disputes, the U.S. Supreme Court noted that, "Labor disputes are ordinarily heated affairs. Both labor and management often speak bluntly and recklessly, embellishing their respective positions with imprecatory language." Defendants are also subject to the actual malice standard as a public contractor and limited public figure. *New York Times Co. v. Sullivan*, 376 U.S. 254 (U.S. 1964). Other than the bald assertion that Plaintiffs' acted with malice, there are no

allegations to that would lend any plausibility to that conclusion. To the contrary, the findings of the various government agencies that investigated the Vanderbilt Defendants compels the conclusion that Plaintiffs were acting out of concern for their own safety and the public interest in reporting the Defendants violations. Nothing in the counterclaims' many allegations suggests any reason or motive that would provide a plausible basis for assuming that Plaintiffs were acting with malice. The claim thus fails to meet the *Iqbal* standard.

### B. DEFENDANTS' FAIL TO STATE A CLAIM FOR FALSE LIGHT INVASION OF PRIVACY (Count 2)

The statute of limitations for oral "false light/invasion of privacy" claims is the same six months that applies to defamation claims.[12] Tenn. Code Ann. 28-3-103 (2003). *See West v. Media Gen. Convergence, Inc.,* 53 S.W.3d 640, 648 (Tenn. 2001). Moreover, false light claims require the same specific allegations of malice and falsehood as defamation claims and the same privileges applicable to statements made in legal proceedings apply. *Id.* at 647-648. Finally, Vanderbilt Landscaping LLC has no false light claim in any event as the tort does not apply to business entities. *Media General,* 53 S.W.3d at 648. Accordingly, Defendants false light claim must be dismissed for the same reasons as their defamation claim.

### C. DEFENDANTS' FAIL TO STATE A CLAIM FOR TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS (Count 3)

A cause of action for tortious and/or intentional interference with business relations requires allegations of the following:

(1) an existing business relationship with specific third parties or a prospective relationship with an identifiable class of third persons;

(2) the workers' knowledge of that relationship and not a mere awareness of Vanderbilt's business dealings with others in general;

---

[12] The discovery rule is also inapplicable to False Light claims. *Daniel v. Taylor,* 2009 WL 774428 at *5 (Tenn. App. March 25, 2009).

Case 3:11-cv-00276   Document 37   Filed 05/31/11   Page 18 of 28 PageID #: 311

(3) the defendant's intent to cause the breach or termination of the business relationship;

(4) the defendant's *improper motive or improper means*; and

(5) damages resulting from the tortious interference.

*See*, *Trau-Med of America, Inc. v. Allstate Insurance Company, 71 S.W.3d 691, 701 (Tenn. 2002)*

Defendants do not plead sufficient facts to support this claim.   The only contract or prospective contract (element one) pled is the prospective contract with Metro Nashville. (Counterclaim at ¶¶ 59, 75-84).  Element Two requires the Defendants to plead the workers' knowledge of that relationship (as opposed to a mere awareness of Vanderbilt's general business dealings).  Yet Defendants have not and cannot meet that element of the claim.   Beyond mere conclusory statements, Defendants do not plead that Plaintiffs worked on the Metro Nashville contract, had any knowledge of that contract, or were even working at Vanderbilt at the time contract negotiation were ongoing.  Defendants have offered no facts as to how Plaintiffs could have had specific knowledge of that prospective business relations.   In the absence of any such pleadings Defendants have not satisfied element two of the claim.

Furthermore, Defendants have not and cannot plead either that Plaintiffs' "predominate purpose is to injure [them]" (element three) or that Plaintiff employed "improper means" or "improper motive" (element four) as distinguished from cases where Plaintiff induced a breach of contract to benefit himself. *Trau-Med at 701*.  In order for these elements of IIBR to be satisfied, the primary purpose with which the plaintiff acts must be to cause injury or harm to the defendant, and the defendant must be damaged thereby.  *Trau-Med* clarified the scope of what acts could be considered to constitute improper means as opposed to reasonable competition and self-interest, including,

> Means that are illegal or independently tortious, such as violations of statutes, regulations, or recognized common-law rules; violence, threats or intimidation, bribery, unfounded litigation, fraud,

> misrepresentation or deceit, defamation, duress, undue influence, misuse of inside or confidential information, or breach of a fiduciary relationship; and those methods that violate an established standard of a trade or profession, or otherwise involve unethical conduct, such as sharp dealing, overreaching, or unfair competition.

*Trau-Med of Am., Inc.,* 71 S.W.3d at 701. Presuming Defendants allegations to be true, Plaintiffs cooperated with government investigations, communicated with the media, and filed this lawsuit alleging violations of their rights during their employment with Vanderbilt and seeking compensation. Such conduct does not meet the element of this tort claim. To the extent Defendants allegation of improper means rests on the assertion that Plaintiffs committed "defamation" they have failed to plead that improper means for the reasons set forth above.

The fifth element of a tortuous interference with business claim is damages resulting from the tortuous interference. However, the only specific allegation of injury in the counterclaim is set forth in paragraph 59 in which Defendants state:

> As a result of the Defamatory Articles, the recent City Paper article, and Counter-Defendants' baseless filing of this lawsuit, Vanderbilt has suffered damages including the loss of a five (5) year contract with the Metropolitan Government of Nashville, for $275,000 per year, for which it appeared to be the successful bidder, and damages to its reputation and goodwill.

(Answer at ¶ 59). As set forth above, any injury arising from the filing of the lawsuit and the City Paper article (which was based on the allegations in the lawsuit), are privileged and do not state a cause of action. By admitting that their damages were caused by the combination of these allegedly privileged and unprivileged activities, Defendants have failed to plead damages that can reasonably be said to have been proximately caused by the unprivileged activities. Accordingly, Defendants have failed to satisfy the damages element of this claim.

Therefore, this Court should dismiss Defendants' counterclaim for Tortious and/or Intentional Interference with Business Relations pursuant to Fed. R. Civ. P. 12(b)(6) for failure

to plead elements two, three, four, and five.  Defendants' inclusion of this purported tort claim, unsupported by the pleadings, facts, or even Defendants' own theory of the case, is yet another example of Defendants' intent to present a laundry list of potential liabilities designed to threaten and coerce Plaintiffs.

### D.  DEFENDANTS' FAIL TO STATE A CLAIM FOR PROCUREMENT OF BREACH OF CONTRACT (Count 4)

In order to recover for procurement of breach of contract, a plaintiff must prove seven elements: (1) there must be a legal contract; (2) the wrongdoer must have knowledge of the existence of the contract; (3) there must be an intention to induce its breach; (4) the wrongdoer must have acted with malice; (5) there must be a breach of contract; (6) the act complained of must be the proximate cause of the breach of contract; and, (7) there must have been damages resulting from the breach of contract. *Buddy Lee Attractions, Inc. v. William Morris Agency, Inc.*, 13 S.W.3d 343, 354-55 (Tenn.Ct.App.1999); T.C.A. § 47-50-109.  Defendants pleading fails to state a cause of action because it does not satisfy these elements. (Answer at ¶ 88).

The Tennessee Supreme Court has held, "[i]n order to recover for procurement of breach of contract, the [moving party] must prove that there was a legal contract for a designated term [.]" *Forrester v. Stockstill,* 869 S.W. 2d 328, 330 (Tenn. 1994).   In *Forrester*, the Court found the prospective relationship of at-will employment inadequate to meet the first prong o the statute. *See, e.g., Lamdin v. Aerotek,* 2010 U.S. Dist. LEXIS 104306 (Sept. 30, 2010) (dismissing claim for procurement of breach of contract because Plaintiff's allegation of ongoing employment was insufficient to meet pleading requirement of "the existence of a contract for a fixed or designated period of time.").  In this case, Defendant merely asserts interference with a *prospective* business relationship – an "expected agreement" with the City of Nashville. (Answer at ¶ 88).  Inasmuch as there was no contract with the City there could be no breach of that

contract and the claim must fail because Defendant had not and cannot plead the first element—existence of a legal contract. *Cf. Mac'Kie v. Wal-Mart Stores*, 127 F.3d 1102, 1997 WL 668950 (6th Cir. 1997).

Vanderbilt has also failed to sufficiently plead the remaining elements of this tort claim. Vanderbilt has alleged no facts as to how Plaintiff workers would have had knowledge of Vanderbilt's prospective contracts. Indeed, Vanderbilt does not plead the timeframe of the purported negotiations on this contract, but they appear to be after Plaintiffs separated from Vanderbilt's employment.

Furthermore, Vanderbilt also fails to sufficiently plead that Plaintiffs acted with an intention to induce action by the Nashville government on the prospective contract and with malice.

Finally, just as in the tortuous interference claim, Vanderbilt has failed to plead that actions by Plaintiffs which are not protected by litigation privilege were the proximate cause of the actions by the Nashville government. Vanderbilt's pleadings admit that their damages flow from the fact that Plaintiffs cooperated with ongoing government investigations and filed this litigation – both privileged actions which bar recovery for those alleged damages.

### E. DEFENDANTS FAIL TO STATE A CLAIM FOR INTENTIONAL OR RECKLESS INFLICTION OF EMOTIONAL DISTRESS (Count 5)

Defendants' Fifth counterclaim must be dismissed for failure to allege actions rising to the level of "extreme and outrageous conduct." There are three essential elements to a cause of action: (1) the conduct complained of must be intentional or reckless; (2) the conduct must be so outrageous that it is not tolerated by civilized society; and (3) the conduct complained of must result in physical or serious mental injury. *Bain v. Wells,* 936 S.W.2d 618, 622 (Tenn. 1997).

Defendants allege no physical injury in the complaint and, as a result, Defendants can

only state a claim if they allege severe emotional distress caused by conduct "so outrageous that it cannot be tolerated by a civilized society." *Id.* It is not sufficient that a defendant "has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress." *Id.*

Tennessee Courts regularly use the Restatement as a guide to the high threshold standard as to whether conduct is "so intolerable" as to be tortious under this claim:

> The cases thus far decided have found liability only where the defendant's conduct has been extreme and outrageous. It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community. *Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous.'*

*Bain*, 936 S.W.2d at 622-23, (quoting Restatement (Second) of Torts § 46 cmt. d (1965)) (emphasis added); *see also Goldfarb v. Baker*, 547 S.W.2d 567, 568-69 (Tenn. 1977).

Defendants' allegations fall far short of this exacting standard. Complaining to governmental agencies, participating in investigations by those agencies, speaking to the media about matters of public concern and seeking vindication of statutory and common law rights – rather than being "utterly intolerable" to a civilized society – are the hallmark of a civilized society. The peculiarity of Defendants' outrage claim is highlighted by the degree to which government investigations have confirmed Plaintiffs' allegations. *Compare McDermid v. Discovery Financial,* 342 Fed. Appx. 138, 148 (6th Cir. 2009) (threats of criminal prosecution do not constitute outrageous conduct); *Norman v. Rolling Hills Hosp.,* 2010 WL 2901881 (W.D. Tenn. July 22, 2010) (termination of employment not outrageous conduct); *Caruso v. St. Jude's*

*Hospital,* 215 F.Supp2d 930, 939 (W.D. Tenn)(same); *Swallows v. Western Electric Inc.,* 543 S.W.2d 581 (Tenn. 1976) (harassing and investigating plaintiff for six months failed to state outrageous conduct); *Odell v. Odell,* 303 S.W.3d 694, 696 (Tenn. App. 2008) (allegations of intimidation and verbal assault not outrageous conduct); *Fann v. City of Fairview Tenn.,* 905 F.W.2d 167 (Tenn. App. 1994) (disclosure of confidential criminal records in newspaper did not state claim for outrageous conduct); *Hill v. Hill,* 1993 WL 312671 (Tenn., App. 1993) (filing retaliatory lawsuit not outrageous), *with Lourcey v. Estate of Scarlett,* 146 S.W.3d 48, 52 (Tenn. 2004) (shooting of plaintiff and intentional murder and suicide committed by defendant in front of plaintiff is outrageous conduct).

## F. DEFENDANTS FAIL TO STATE A CLAIM FOR ABUSE OF PROCESS (Count 6)

A claim for abuse of process must allege: (1) the existence of an ulterior motive; and (2) an act in the use of process other than such as would be proper in the regular prosecution of the charge. *See Priest v. Union Agency*, 174 Tenn. 304, 125 S.W.2d 142, 143 (Tenn.1939). The Supreme Court of Tennessee has explained that "the gist of the tort [of abuse of process] is not commencing an action or causing process to issue without justification, but misusing, or misapplying process justified in itself for an end other than that which it was designed to accomplish." *Givens v. Mullikin ex rel. Estate of McElwaney*, 75 S.W.3d 383, 400 (Tenn.2002). Defendants have failed to allege this essential element of misusing or misapplying process. Even construing their allegations in the light most favorable to Defendants, they have alleged nothing more than a proper use of process – i.e. to commence a lawsuit – with an allegedly spiteful or malicious purpose. That is insufficient to state a cause of action. *Givens,* 75 S.W.3d at 383.

Defendants' inclusion of this claim, unsupported by the pleadings, is yet another example of Defendants' intent to present a laundry list of potential liabilities designed for the sole purpose

of threatening and coercing Plaintiffs.

## G.  DEFENDANTS FAIL TO STATE A CLAIM FOR CIVIL CONSPIRACY (Count 7)

In Tennessee, civil conspiracy is defined as, "a combination between two or more persons to accomplish by concert an unlawful purpose, or to accomplish a purpose not in itself unlawful but by unlawful means." *Baker v. Hooper,50 S.w.3d 463 (Tenn. Ct. App. 2001)*.

Plaintiff's Amended Complaint also attempts to state a cause of action for civil conspiracy. As this Court explained in *Kincaid v. SouthTrust Bank*:

> The elements of a cause of action for civil conspiracy are: (1) a common design between two or more persons, (2) to accomplish by concerted action an unlawful purpose, or a lawful purpose by unlawful means, (3) an overt act in furtherance of the conspiracy, and (4) resulting injury. Morgan v. Brush Wellman, Inc., 165 F.Supp.2d 704, 720 (E.D.Tenn.2001). Conspiracy claims must be pled with some degree of specificity. McGee v. Best, 106 S.W.3d 48, 64 (Tenn.Ct.App.2002) (citing Haynes v. Harris, No. 01A01–9810–CV–00518, 1999 WL 317946, at *2 (Tenn.Ct.App.1999)) (citations omitted). Conclusory allegations, however, unsupported by material facts will not be sufficient to state such a claim.

*Id.*, 221 S.W.3d 32, 38 (Tenn.Ct.App.2006).  Where there are insufficient allegations of unlawful purpose or unlawful means, no claim for civil conspiracy has been stated. *Odell v. Odell*, 303 S.W.3d 694, 696 (Tenn. App. 2008)

The relevant factual paragraphs 42-60 of the Counterclaim, fail to support a claim of conspiracy.  Defendants do not state what the common design was, what the unlawful purpose was or the unlawful means for its accomplishment.  They no plead overt actions by any particular Plaintiff in furtherance of the conspiracy.  In the description of the counterclaim, Defendants simply make the conclusory claim that Plaintiffs have each "committed one or more overt acts in furtherance of the conspiracy," and that "Counter-Plaintiffs have been injured by Counter-Defendants' civil conspiracy." (Counterclaim at ¶¶ 106- 110).  Accordingly,

Defendants have failed to plead this claim with specificity to meet the *Iqbal* standard and in fact neither Plaintiffs nor this Court is on notice of even the most basic content of this purported claim. Moreover, to the extent this claim appears to be based on anything at all, it is based on the previously alleged tort claims, none of which states a cause of action for the reasons set forth above, and therefore none of them can support a claim for conspiracy.

Recognizing the importance of collective action to democracy, Courts frown on intentional and even negligent actions that chill First Amendment activity, this Court should hold Defendants to a high level of clarity. "There are, of course, some activities, legal if engaged in by one, yet illegal if performed in concert with others, but political expression is not one of them." *NAACP v. Claiborne,* 485 U.S. 886, 907 (1982) (protecting speech and actions aimed at protecting minority rights from claims of criminal activity).

### H. Defendants Fail to State a Claim for Punitive Damages

This Court should strike Defendants' claim for "punitive damages." "'Damages' and 'punitive damages' are remedies… but [they] are not stand-alone causes of action." *Jackson v. Falcon Transp. Co.*, 2011 U.S. Dist. LEXIS 46369 (M.D. Tenn. Apr. 29, 2011). Plaintiffs dispute that Defendants have made any claim for which punitive damages would be warranted. Previous claims notwithstanding, however, this Court should strike "punitive damages" as a stand-alone claim. Punitive damages are not a cause of action in and of themselves. They are a type of damages for which a litigant may qualify depending on other claims. The Court should dismiss this counterclaim pursuant to Fed. R. Civ. P. 12(b)(6), recognize that Defendants' inclusion of a type of damages as another purported tort claim is yet another example of Defendants' intent to present a laundry list of potential liabilities designed to threaten and coerce Plaintiffs.

## I. Defendants Fail to Plead Actual Damages as an Element to Any Claim.

In closing, Plaintiffs reiterate that Defendants have failed to sufficiently plead causation and damages as an element to any of the counterclaims herein.  Defendants' merely allege a prospective contract on which Vanderbilt "appeared" to be the highest successful bidder. (Answer at ¶¶ 59-60).  These speculations are not sufficient to show damages necessary for these claims. *Bell Atlantic Corp. v. Twombly*.  Moreover, while Defendants concede that Plaintiffs cooperated with government investigations, communicated with the media, and filed this litigation over the same labor dispute, Defendants do not allege which actions caused the purported damages.

## CONCLUSION

For the reasons more fully discussed herein, the counterclaims fail to meet the 12(b)(6) standard and are aimed at discouraging the exercise of speech and petition rights and silencing critics of the labor practices of Vanderbilt Landscaping LLC and its principles. Plaintiffs hereby urge this Court to dismiss the counterclaims in Defendants' answer.

Respectfully Submitted,

s/Charles P. Yezbak, III
Charles P. Yezbak, III
Tenn. B.P.R. No. 18965
2002 Richard Jones Road, Suite B-200
Nashville, Tennessee 37215
(615) 250-200
(615) 250-2020 Facsimile
Yezbak@yezbaklaw.com

Jennifer J. Rosenbaum
LSBA No. 31946
*Admitted to practice in the U.S. Dist. Ct., M.D. of Tenn.*
**New Orleans Workers' Center**
**For Racial Justice**
217 N. Prieur St.
New Orleans, LA 70112

(504) 309-5165
jjrosenbaum@nowcrj.org

Edward Tuddenham
Texas Bar No. 2028300
*Pro Hac Vice Application Anticipated*
1339 Kalmia Rd. NW
Washington DC 20012
(202) 249-9499
etudden@io.com

## CERTIFICATE OF SERVICE

   This is to hereby certify that I have this the 31st day of May electronically filed the above with the Clerk of the Court using the CM/ECF system which will automatically send email notification of such filing to the following attorneys of record:

          Mekesha H. Montgomery (BPR #25831)
          Brian C. Neal (BPR #22532)
          424 Church Street, Suite 1600
          Nashville, Tennessee 37219
          (615) 251-5550
          (615) 251-5551 *facsimile*

          *Attorneys for Defendants Vanderbilt*
          *Landscaping, LLC, Larry Vanderbilt Sr.,*
          *and Joffrey Vanderbilt*

          Matthew A. Boyd
          Tennessee Bar No. 017898
          Georgia Bar No. 027645
          mboyd@hptylaw.com
          Ronald G. Polly, Jr.
          Georgia Bar No. 538264
          rpolly@hptylaw.com
          *Counsel for the ABM Defendants*

Dated May 31, 2011


s/ Charles P. Yezbak, III
Charles P. Yezbak, III